UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| RAFAEL L. WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cv-00421-JPH-MJD |
| | ) | |
| FRANK VANIHEL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Order Denying Motions for Preliminary Injunction**[1]

Plaintiff Rafael Walker, an inmate at Wabash Valley Correctional Facility, filed this action pursuant to 42 U.S.C. § 1983 alleging that he did not receive adequate mental health care in the Fall of 2021 and attempted suicide. He seeks a preliminary injunction directing that he be transferred and placed in general population, given access to the courts, and provided mental health treatment by a different provider.[2]

---

[1] Mr. Walker sought a preliminary injunction or a temporary restraining order. Because the defendants have been served and have responded to the motions, Mr. Walker's motions are treated as motions seeking a preliminary injunction. *See* Fed. R. Civ. P. 65(b) (providing circumstances in which a temporary restraining order may issue to a party who has not been served).

[2] The scope of injunctive relief available is limited by and must correspond to the claims before the Court. The only claims proceeding in this action are against Ms. Clarke and Centurion for deliberate indifference to serious mental health medical needs, dkt. 38. The scope of injunctive relief available is limited to those claims and does not include claims related to his placement in segregation, his access to the courts, or his foot injury. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) ("[T]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." (cleaned up)); *see also DeBeers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) ("A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally."). Therefore, this Order discusses only Mr. Walker's requests regarding his mental health care.

# I. Background

Mr. Walker alleges that he has a mental health illness and that he attempted suicide in September 2021 because mental health professional defendant Sarah Clarke failed to properly treat him or refer him to psychologist Dr. Mary Sims. Dkt. 28 at 1–3.

### A. Mr. Walker's mental health is evaluated upon his arrival at Wabash Valley

Mr. Walker was transferred to Wabash Valley on January 28, 2021. Dkt. 46 at 2. His behavioral code was listed as A, free of mental illness and physical impairment. *Id*. at 1.

Sarah Clarke, a mental health care provider at Wabash Valley, saw Mr. Walker the next day for an initial mental health restrictive housing review for placement in the special confinement unit ("SCU"). *Id.* at 3–8. Mr. Walker denied any current mental health issues and denied suicidal ideation. *Id*. Ms. Clarke advised Mr. Walker of monthly mental health rounds in the SCU and use of the healthcare request form system for any mental health complaints. *Id*. Ms. Clarke determined that Mr. Walker had no mental health contradictions for placement in the SCU and did not display an apparent need for mental health treatment at that time. *Id*.

On March 16, 2021, Mr. Walker's IDOC behavioral code was again listed as A, free of mental illness and physical impairment. *Id.* at 9.

### B. Mr. Walker is seen by Dr. Sims in response to his complaints about mental health and suicidal thoughts

In September 2021, Dr. Sims saw Mr. Walker in response to his complaints of mental health issues and suicidal thoughts. *Id*. at 10. Dr. Sims spoke with Mr. Walker, and he initially confirmed having suicidal thoughts. *Id*. Dr. Sims requested that custody staff remove Mr. Walker from his cell to provide further care, but Mr. Walker refused, denying that he intended to harm himself. *Id*.

Dr. Sims determined that Mr. Walker was not truly suicidal and did not appear at risk for mental health decompensation. *Id*. His complaints were aimed at being punished for a recent sweep

of the SCU where officers removed nonapproved property. *Id*. Dr. Sims determined that Mr. Walker was using the mental health system to make a statement about his perceived treatment in the SCU. *Id*.

### C. Mr. Walker is regularly seen by Dr. Sims, Ms. Clarke and other mental health care providers over the next several months

On October 12, 2021, Ms. Clarke saw Mr. Walker after he submitted healthcare request forms complaining about his mental health. *Id.* at 12–13. They discussed Mr. Walker's feelings of unfairness and perceived mistreatment as it related to IDOC staff. *Id.* Ms. Clarke charted that Mr. Walker's mental status was unremarkable and that she would send Plaintiff additional information and monitor him per policy. *Id.*

On December 6, 2021, Ms. Clarke again saw Mr. Walker after he submitted healthcare request forms about his mental health. *Id.* at 14–15. Mr. Walker reported a long list of mental health symptoms but was vague when questioned clinically about those symptoms. *Id*. Ms. Clarke noted that Mr. Walker's mental status was unremarkable. *Id*. He displayed full affect, clear speech, and logical thought processes. *Id.*

About two weeks later, Ms. Clarke again met with Mr. Walker to administer a Personality Assessment Inventory. *Id.* at 16–17. Ms. Clarke explained the purpose and limits of the inventory as psychological assessment and informed Mr. Walker that the test would be scored and interpreted by the lead psychologist, Dr. Sims. *Id*. Ms. Clarke noted that Mr. Walker's mental status remained unremarkable. *Id.* He displayed full affect, clear speech, and logical thought processes. *Id.* She planned to follow up once the psychological assessment test was completed and interpreted. *Id.*

On December 28, 2021, nursing staff charted that they called mental health after Mr. Walker voiced suicidal thoughts during the evening medication pass. *Id.* at 18–20. The nurse

charted that Mr. Walker refused medical care and his attitude was hostile, demanding, and manipulative. *Id*. Dr. Sims placed Mr. Walker on suicide watch. *Id*.

The next day, December 29, 2021, Dr. Sims saw Mr. Walker and he reported hearing voices telling him to hurt himself and to hurt others. *Id.* at 21–28. He also reported three prior suicide attempts and spoke of being assaulted by officers, falsely accused, and attempting to hang himself. *Id*. Dr. Sims charted that Mr. Walker placed a string around his neck in March 2020. *Id.* Dr. Sims determined that Mr. Walker reported auditory hallucinations but was present during the interview and did not appear to be responding to external stimuli. *Id.* Mr. Walker's range of affect was full, and his thoughts were organized, logical, and coherent. *Id.* Dr. Sims ordered suicide watch and precautions. *Id.*

Dr. Sims saw Mr. Walker again two days later and he complained of hearing voices from the sergeant at the prior facility who allegedly assaulted him. *Id.* at 29–31. Mr. Walker also stated that officers were saying things to him that he perceived as threatening such as "check-in" or "what's wrong." *Id*. Dr. Sims again charted that Mr. Walker continued to report auditory hallucinations but remained present during the interview and did not appear to be responding to external stimuli. *Id*. Mr. Walker's range of affect was full and his thoughts were organized, logical, and coherent. *Id*. Dr. Sims kept Mr. Walker on suicide watch and ordered continued suicide precautions. *Id*.

Ms. Clarke saw Mr. Walker on January 3, 2022. *Id.* at 32–34. He denied any current thoughts of self-harm or suicide and denied hearing voices. *Id*. Ms. Clarke charted that Mr. Walker's mental status remained unremarkable. *Id.* She continued suicide watch as a precaution. *Id*.

The next day, Ms. Clarke went to Mr. Walker's holding cell after officers reported that he was noncompliant with orders. *Id.* at 35–37. Mr. Walker covered his light, cell front, and refused to give up amenities that violated his suicide precaution orders. *Id*. Mr. Walker became agitated and angry and reported that Ms. Clarke was holding him hostage. *Id*. He yelled at custody in attempts to get Dr. Sims, the lead psychologist, to come see him. *Id*. Ms. Clarke charted that Mr. Walker was agitated, but he had full affect, clear speech, and logical thought processes. *Id.*. Ms. Clarke again continued Mr. Walker's suicide orders. *Id*. As Ms. Clarke left the unit, she could hear Mr. Walker yelling at others to "call my people, it's an emergency." *Id*. Ms. Clarke later informed Dr. Sims of Mr. Walker's request to see her. *Id*.

Later that day, Dr. Sims received a phone call from Mr. Walker's sister. *Id.* at 38–39. Ms. Walker was angry that Mr. Walker was in the "suicide tank" for more than 24 hours and stated that he was not getting food or clothing and people were threatening to harm him. *Id*. Dr. Sims explained Mr. Walker's suicide threats and read her his statements. *Id*.

Ms. Clarke met with Mr. Walker again on January 5, 2022, and he reported feeling good and continued to deny suicidal thoughts, plans to harm himself, or any mental health issues. *Id.* at 40–42. Ms. Clarke determined that Mr. Walker did not present with significant suicidal thoughts or mental health issues at that time. *Id*. She discontinued suicide watch and recommended housing per the IDOC's recommendation. *Id*.

The next day, Ms. Clarke saw Mr. Walker in a post-suicide watch follow up. *Id.* at 43–45. Mr. Walker was recently moved to a strip cell by officers. *Id*. Mr. Walker reported that he was complying with staff, but they used force on him and pushed him down the stairs. *Id*. Ms. Clarke spoke with officers who stated that Mr. Walker refused various orders, including an order to remove a sheet from his cell front and an order to put on handcuffs. *Id*. Mr. Walker's mental status

5

remained unremarkable: he did not make any suicidal statements during the encounter and denied hallucinations or delusions. *Id*. Ms. Clarke determined that Mr. Walker did not present with any mental health issues at that time. *Id*.

Dr. Sims completed Mr. Walker's Personality Assessment Inventory that same day. *Id.* at 46. She charted that his responses were divergent from what was known about him through mental health treatment. *Id*. Several of the validity scales indicated responses that were inconsistent, careless, malingering, or possibly defensive. *Id*. She determined that it was not possible to meaningfully interpret the results of the psychological assessment. *Id*.

On January 10, 2022, Dr. Sims saw Mr. Walker in a mental health visit. *Id*. at 53–55. When asked how he was doing, Mr. Walker reported that he was "doing OK." *Id*. Dr. Sims charted that Mr. Walker's mental status was unremarkable and determined that he did not present with an Axis 1 diagnosis and was not at high risk to decompensate. *Id*.

On January 12, 2022, Ms. Clarke saw Mr. Walker in a post suicide watch follow up. *Id.* at 56–58. Ms. Clarke advised Mr. Walker on the results of the Personality Assessment Inventory. *Id*. Mr. Walker's main concern was feeling that he was not provided with adequate medical care after an incident with correctional officers. *Id.* He did not report any mental health symptoms and did not endorse suicidal ideation. *Id*.

Ms. Clarke saw Mr. Walker about a week later in a post suicide watch follow up during which he denied any significant mental health issues and stated that he was "good." *Id.* at 59–60. Ms. Clarke charted that Mr. Walker's mental status was unremarkable and he displayed full affect, clear speech, and logical thought processes. *Id.* She determined that he did not present with any mental health issues. *Id*.

On February 2, 2022, Ms. Clarke went to visit Mr. Walker in a post suicide watch follow up. *Id.* at 63–64. Mr. Walker's cell front was completely covered. *Id*. Ms. Clarke called Mr. Walker's name several times, but he did not respond. *Id*. Officers on the unit reported that Mr. Walker had engaged with them that day. *Id*. Ms. Clarke noted that Mr. Walker refused the session and determined that no further monitoring was needed for suicide follow up. *Id*.

Ms. Clark again attempted to visit Mr. Walker about a month later for a therapy session after he submitted healthcare request forms. *Id.* at 65. Again, Mr. Walker's cell front was covered, and he did not respond to Ms. Clarke. *Id*. Ms. Clarke issued a written response to Mr. Walker's healthcare request forms. *Id*.

On March 4, 2022, Ms. Clarke saw Mr. Walker in a mental health visit after he submitted healthcare request forms claiming to be suicidal. *Id.* 66–72. Ms. Clarke charted that she had attempted to see Mr. Walker on several occasions that month, but his cell was completely covered, and he did not respond to her calls. *Id*. Ms. Clarke requested that custody escort him to a cell where she would be able to speak with him. *Id*. Mr. Walker stated, "I'm not suicidal, but I've been trying to get you to come speak with me and you won't." *Id*. Ms. Clarke told Mr. Walker that she had made several attempts to speak with him. *Id*. Mr. Walker responded, "I must have just not heard you." *Id*. Although she believed that Mr. Walker's suicide reports were linked to secondary gain, Ms. Clarke placed Mr. Walker on suicide watch as a precaution. *Id*.

On March 5, 2022, Ms. Clarke met with Mr. Walker and charted that he did not display any mental health needs or suicidal ideation. *Id.* at 73–75. Ms. Clarke charted that Mr. Walker's mental status was unremarkable. *Id*. He displayed full affect, clear speech, and logical thought processes. *Id*. Ms. Clarke determined that Mr. Walker presented with no significant suicidality or mental health issue. *Id.* She discontinued close observation. *Id*.

Two days later, Ms. Clarke saw Mr. Walker again and he denied thoughts or plans to harm himself. *Id.* at 76–78. Ms. Clarke charted that Mr. Walker's mental status was unremarkable. *Id.* She determined that Mr. Walker presented with no signs or symptoms of a mental illness. *Id.* She advised Mr. Walker that in the future if he submitted healthcare request forms complaining of suicidal thoughts, he would be placed on suicide watch. *Id.* She further informed him that if she came to his cell to speak with him and he covered his cell or did not respond, she would notify custody. *Id.*

## II. Discussion

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). To meet the threshold showing of a preliminary injunction, Mr. Walker first must show that "(1) without this relief, [he] will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) [he] has some likelihood of prevailing on the merits of [his] claims." *Speech First, Inc. v. Killen*, 968 F.3d 628, 637 (7th Cir. 2020).

"A movant's showing of likelihood of success on the merits must be strong." *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020) (quotation marks omitted). A "better than negligible" likelihood of success is not enough. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762−63 (7th Cir. 2020).

"'To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 751 (7th Cir. 2021) (quoting *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc)). As to

8

the first element, a "medical condition is serious if it 'has been diagnosed by a physician as mandating treatment' or 'is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). For the second element, Mr. Walker must show that the defendants' medical decisions were "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that [they] ... did not base the decision[s] on such a judgment." *Proctor v. Sood*, 863 F.3d 563, 568 (7th Cir. 2017).

For the limited purpose of deciding Mr. Walker's motion for a preliminary injunction, the Court assumes without deciding that Mr. Walker would be able to show that he has a serious medical condition.

The defendants argue that Mr. Walker has not shown that they have been deliberately indifferent to his need for mental health treatment. Mr. Walker asserts in his motion for a preliminary injunction that the defendants failed to respond timely to his suicide threats and that he was denied health services. The defendants point out that Mr. Walker's medical records show that Ms. Clarke responded to his suicide threats and met with him regularly, tested him for mental health diagnosis, and concluded that he did not have a mental health illness or true suicidal ideation. In reply, Mr. Walker again argues that the defendants did not respond to his healthcare requests in a timely manner and asserts that his medical providers have misrepresented his state of mind and his statements in his medical records. In support of this argument, he points to a delayed response to his threat of suicide in the Fall of 2021.

He does not, however, provide evidence regarding the length of the alleged delay or who was responsible for it. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation.").

He also has not pointed to evidence to support a conclusion that this delay was the result of any defendants' disregard of a risk to him. *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020). Further, while he asserts generally that his mental status has been misrepresented in his medical records, Mr. Walker does not identify specific portions of his medical records that he contends are incorrect.

The record before the Court at this stage shows that Mr. Walker was evaluated by mental health care professionals upon his arrival at Wabash Valley in January 2021 and found to not have any mental illness; Dr. Sims evaluated Mr. Walker in September 2021 in response to his complaints of suicidal thoughts, and determined that he was not suicidal or at risk and that he was using the mental health system to make a statement about his perceived treatment in the SCU; and over the next several months, Mr. Walker was regularly seen, evaluated and tested by mental health professionals. During this time, Mr. Walker was placed on suicide watch on several occasions in response to his complaints of suicidal thoughts, and each time taken off suicide watch after being seen and evaluated by mental health professionals. There is no evidence that Mr. Walker was ever determined to have a mental illness. On this record, Mr. Walker has not established a reasonable likelihood of success on the merits of his claims. *See Harper v. Santos*, 847 F.3d 923, 927 (7th Cir. 2017) (no deliberate indifference when doctor continued to monitor, assess, and attempt to treat patient's complaints of pain); *Goetsch v. Ley*, 444 Fed. App'x 85, 88 (7th Cir. 2011) (prison mental health staff were not deliberately indifferent to suicide risk when they evaluated him, analyzed his behaviors, and determined that he was not a threat to himself).

Because Mr. Walker has not shown a likelihood of success on the merits justifying a preliminary injunction, the Court does not consider the other preliminary injunction factors. *See Adams v. City of Chicago*, 135 F.3d 1150, 1154 (7th Cir. 1998).

### III. Conclusion

As discussed above, plaintiff Rafael Walker has not established his entitlement to preliminary relief. Accordingly, his motions for a preliminary injunction, dkt. [24], and dkt. [28], are **DENIED**.

**SO ORDERED.**

Date: 7/12/2022

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

RAFAEL L. WALKER
166671
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All Electronically Registered Counsel