UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

RAFAEL L. WALKER,                          )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )        No. 2:21-cv-00421-JPH-MJD
                                           )
FRANK VANIHEL, et al.,                     )
                                           )
                    Defendants.            )

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Rafael Walker is incarcerated by the Indiana Department of

Correction ("IDOC").  He alleges that when he was incarcerated at Wabash

Valley Correctional Facility ("WVCF"), correctional and medical staff were

deliberately indifferent to his suicidal condition and retaliated against him.  For

the reasons that follow, the defendants' motions for summary judgment are

**GRANTED IN PART AND DENIED IN PART**.

## I.
## Standard of Review

A motion for summary judgment asks the Court to find that a trial is

unnecessary because there is no genuine dispute as to any material fact and,

instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ.

P. 56(a).  When reviewing a motion for summary judgment, the Court views the

record and draws all reasonable inferences from it in the light most favorable to

the nonmoving party.  *Khungar v. Access Cmty. Health Network,* 985 F.3d 565,

572–73 (7th Cir. 2021).  It cannot weigh evidence or make credibility

1

determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Walker and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

At all times relevant to the allegations in the complaint, Mr. Walker was an IDOC prisoner housed at Wabash Valley Correctional Facility.

#### 1. Medical Defendants

At all times relevant to the allegations in the complaint:

Centurion Health of Indiana, LLC, provided medical treatment to inmates at WVCF.

Dr. Mary Ruth Sims worked for Centurion as a psychologist at WVCF. *Id.* ¶ 2.

Sarah Clarke worked for Centurion as a mental health professional. *See id.* ¶ 13.

Nurse Heather Lowell-Pangallo, Kim Hobson, Sara Bedwell, Melissa Corrigan, Nurse Taylor Hill, and Nurse Hannah Bauman-Jones all worked for Centurion. Dkt. 286-1 ¶ 54 (Sims Aff.).

#### 2. Correctional Defendants

At all times relevant to the allegations in the complaint:

Defendant Vanihel was Warden at WVCF. Dkt. 281-15 ¶ 3 (Vanihel Aff.).

Lieutenant Christopher Holcomb was the lead supervisor of custody staff in the Secured Housing Unit ("SHU"). Dkt. 281-7 ¶ 4 (Holcomb Aff.).

Sergeant Ashba was a sergeant at WVCF. Dkt. 281-8 ¶ 4 (Ashba Aff.).

Defendants Niswander, Whippo, and Thompson were correctional officers at WVCF. Dkt. 281-9 ¶ 4 (Niswander Aff.); dkt. 281-10 ¶ 4 (Whippo Aff.); dkt. 281-11 ¶ 4 (Thompson Aff.).

Shelby Crichfield and Tawni Templeton worked as grievance specialists at WVCF.  Dkt. 281-12 ¶ 3 (Crichfield Aff.); dkt. 281-13 ¶ 3 (Templeton Aff.).  Thomas Wellington worked as a grievance supervisor at WVCF.  Dkt. 281-14 ¶ 3 (Wellington Aff.).  Mr. Wellington oversaw the grievance process conducted by the grievance specialists.  *Id.*  In the absence of a grievance specialist, Mr. Wellington acted in their capacity.  *Id.*  Ms. Crichfield, Ms. Templeton, and Mr. Wellington had no authority over medical personnel or when specific inmates received medical or mental health treatment.  Dkt. 281-12 ¶ 6; dkt. 281-13 ¶ 6; dkt. 281-14 ¶ 7.  They would receive grievances from inmates and ensure that the grievances were properly filed in accordance with IDOC Policy.  Dkt. 281-12 ¶ 4; dkt. 281-13 ¶ 4; dkt. 281-14 ¶ 5.  When a grievance related to medical concerns was properly filed, Ms. Crichfield, Ms. Templeton, and Mr. Wellington would forward it to the health services administrator or equivalent medical staff member.  Dkt. 281-12 ¶ 4; dkt. 281-13 ¶ 4; dkt. 281-14 ¶ 5.  The staff member would respond to the grievance, and Ms. Crichfield, Ms. Templeton, or Mr. Wellington would then input and provide the response back to the inmate through his case worker.  *Id.*  If the inmate appealed a grievance response, Ms. Crichfield, Ms. Templeton, or Mr. Wellington would input it into the facility's electronic system, but the warden or warden's designee would respond.  *Id.*

When Mr. Walker submitted a properly filed grievance, the appropriate staff member responded and returned it to him.  Dkt. 281-12 ¶ 5; dkt. 281-13 ¶ 5; dkt. 281-14 ¶ 6.  Any improperly filed grievance, such as a grievance on an

issue that Mr. Walker had previously grieved, was returned to him with information as to why it was returned.  *Id.*

### B. Transfer to Restrictive Housing

Mr. Walker has a history of mental illness stemming from a sexual assault he endured as a child.  Dkt. 306-1 at 430.  Before the events at issue in this case, however, no provider had diagnosed him with any mental health disorder.  Dkt. 286-1 ¶ 9 (Sims Aff.).

Mr. Walker was transferred to the Restrictive Housing Unit at WVCF on January 29, 2021.  Dkt. 286-1 ¶ 10; dkt. 286-3 (Walker Transfer Documents). His medical records reflect that at that time, Mr. Walker did not meet the criteria of serious mental illness.  Dkt. 286-3 at 5.  Mr. Walker received an initial mental health review from Ms. Clarke to ensure that his placement in restrictive housing would not present any unreasonable risk to his mental health.  Dkt. 286-1 ¶ 10.  She determined that Mr. Walker did not need mental health treatment and that there were no contraindications for placement in restrictive housing.  *Id.*; dkt. 286-3 at 7–8.

In March 2021, healthcare services staff renewed Mr. Walker's "A" behavioral health code, which meant he was found to be free of mental illness. Dkt. 286-1 ¶ 11; dkt. 286-3 at 9.

### C. September 2021

In September of 2021, the cells on Mr. Walker's range were flooded with toilet water contaminated with feces and urine.  Dkt. 281-1 at 8.  On September 15, Mr. Walker submitted informal grievances complaining about

the conditions and suicidal thoughts.  Dkt. 291 at 4 (request for interview to

Unit Team).[1] The Medical Defendants contend that September 17 was the first

time Mr. Walker reported to healthcare services staff at WVCF that he was

experiencing any mental or behavioral health issues or concerns.  Dkt. 286-1 ¶

12.

### 1. September 17

On September 17, when Officer Niswander was passing out breakfast

trays, Mr. Walker asked to speak to someone from mental health because he

was having suicidal ideations and thinking of harming himself.  Dkt. 281-1 at

9.  He stated he was tired of being in the cell with contaminated floors.  *Id.*

Officer Niswander told Mr. Walker that he had informed Lieutenant Holcomb,

Ms. Clarke, and Dr. Sims about Mr. Walker's suicidal thoughts.  *Id.* at 10.

That same day, Mr. Walker handed a Request for Health Care Form

("HCRF") to either Nurse Lowell-Pangallo[2] or Nurse Hill, in which he

complained that he was "going thru [*sic*] cruel punishment for the actions of

others, and have not been allowed to speak to my family during a world crisis,"

apparently referring to the COVID-19 pandemic.  Dkt. 286-1 ¶ 12; dkt. 286-4

at 1 (Fall of 2021 Records).  Mr. Walker went on to say that his "mental state is

---

[1] Mr. Walker also contends that his family members called Defendant Vanihel's and Holcomb's offices.  Dkt. 290 at 2.

[2] Mr. Walker states in his response to the motion for summary judgment that he gave this form to Nurse Hill, but he testified as his deposition that he explained to "maybe . . . nurse Heather" during med pass on the 17th that he was still having suicidal thoughts and gave her an HCRF.  Dkt. 281-1 at 12.  Mr. Walker attempts to direct the Court to video evidence of this interaction, but there is no description of these two nurses and therefore no way for the Court to identify them in video footage.

being altered by the inhumane treatment by staff member [*sic*] and need to speak to someone before I do something regrettable." Dkt. 286-4 at 1. Mr. Walker testified that he called out from his cell for help that day and that Ms. Clarke's office was within earshot, across the hall from his cell. Dkt. 281-1 at 27, 49.

Sometime after breakfast, Officer Niswander observed Mr. Walker hanging up a rope and took the rope from him. Dkt. 281-1 at 10–11. Later that day, Mr. Walker made another rope and obtained "a whole bunch of pills from somebody." *Id.* at 13. He took the pills and attempted to hang himself, but the rope broke, causing him to hit his head on the toilet and the floor. *Id.* at 13–14.

### 2. September 18

On September 18, 2021, Mr. Walker submitted an informal request for interview that said:

> I'm writing to inform you that I have been having suicidal thought[s] and told staff and medical I need to speak with someone on 9-17-21 and no one has come to speak with me. I have attempted suicide before and would like to speak with mental health as is my right before I hurt myself.

Dkt. 306-1 at 3. He also submitted an informal request to his unit team stating that he had told medical and custody staff of his suicidal thoughts, but no one had come to treat him. *Id.* at 5. Mr. Walker also submitted a grievance complaining of the state of the unit and suicidal thoughts. Dkt. 291 at 74. This grievance was stamped as received on September 21, and signed by Ms. Templeton on September 30. *Id.*

7

### 3. September 19

On September 19, Mr. Walker submitted another informal request raising the same concerns.  Dkt. 306-1 at 4.  He also submitted an informal request that day stating that his cell and the rec area were covered with trash and bodily fluids, that he was sick, and that his mental health was in imminent danger.  *Id.* at 5.  When healthcare staff received Mr. Walker's HCRF on September 19, they referred it to Ms. Clarke.  Dkt. 286-1, ¶ 13; dkt. 286-4 at 1.

### 4. September 20

Ms. Clarke then met personally with Mr. Walker at his cell on September 20 to conduct an assessment.[3]  Dkt. 286-1, ¶ 13; dkt. 286-4 at 2–4.  Ms. Clarke noted that Mr. Walker initially confirmed that he had been experiencing suicidal thoughts and had made similar reports to his family, who had contacted the facility's litigation liaison earlier that morning.  Dkt. 286-4 at 2. When Ms. Clarke requested officer assistance to remove Mr. Walker from his cell for further observation, Mr. Walker refused and recanted his earlier statement, claiming that he never asserted any attempt to harm himself.[4]  *Id.*

---

[3] Mr. Walker asserts that the defendants were made aware by email in the morning of September 20 that he was having thoughts of self-harm and therefore clearly delayed in seeing him after his complaints.  *See* dkt. 306-1 at 425 (email to defendants Hobson and Sims and forwarded to Clarke).  But even if an email was sent to these defendants in the morning of September 20, there is no evidence regarding when they read it.  In any event, Ms. Clarke visited Mr. Walker on September 20 and Mr. Walker has not shown that any delay in that visit resulted in harm.

[4] While Mr. Walker contends that Ms. Clarke issued a false conduct report against him that day and threatened him, dkt. 306 at 5, he does not dispute that he claimed during this interaction that he had never tried to harm himself.

Mr. Walker threatened to file a grievance and lawsuit against Ms. Clarke.  Dkt. 286-1, ¶ 13; dkt. 286-4 at 2.  Ms. Clarke determined that Mr. Walker did not appear at any risk for decompensation or a risk to himself.  *Id.*  She noted her opinion that Mr. Walker was using mental health resources to make a statement about what he perceived as unjust treatment resulting from a recent security sweep and removal of contraband by correctional officers, which was referenced in his HCRF.  *Id.*  Ms. Clarke did not place Mr. Walker on suicide watch because he presented no risk of harm to himself and exhibited no indications of a serious medical or mental health need.  *Id.*

### D. October - December 2021 Treatment

Ms. Clarke met with Mr. Walker on October 12, 2021, and November 8, 2021.  Dkt. 286-1 at 5-6 ¶¶ 14-16.  She then met with Mr. Walker on December 6, 2021.  Dkt. 286-5 at 3 (December 2021 Records).  Ms. Clarke noted that Mr. Walker remained alert, oriented, and calm.  *Id.*  Mr. Walker reported an extensive list of mental health symptoms and referenced a PTSD diagnosis for which there is no documentation, but when pressed about his reported symptoms, he did not provide details.  *Id.*  Based on her assessment and Mr. Walker's inability to articulate any legitimate, objectively serious mental health disorder or need, Ms. Clarke determined that Mr. Walker's subjective reporting was either subclinical or exaggerated.  *Id.*  Ms. Clarke determined that there was no evidence of any serious mental health need or thoughts of suicide, and Dr. Sims was not aware of any serious mental health need.  Dkt. 286-1, ¶ 15.

Mr. Walker alleges on December 13, 2021, Officer Whippo sexually harassed him. Dkt. 281-1 at 33. He reported to Officers Whippo, Thompson, and Sgt. Ashba that he was having suicidal ideations again. *Id.* at 33–36. Sergeant Ashba said he would tell Ms. Clarke. *Id.* Sergeant Ashba then left Mr. Walker's cell and, upon returning, told Mr. Walker that Ms. Clarke would not see him. *Id.* Later that day, Mr. Walker cut his leg with a razor and ingested pills. Dkt. 281-1 at 38–39.

Ms. Clarke denies having had any knowledge that Mr. Walker said he suicidal that day. She wrote an incident report explaining she was only aware of feigned group disruptions on Mr. Walker's cell block:

> On 12/13/2021 starting at about 830 am I, MHP Clarke, did hear the B 1200 Range making complaints about showers and making complaints about floor officer Whippo. SCU Sergeant J. Ashba went out to the range to address complaints. Continuing to lunch chow, offenders on the B 1200 range continued to ask for various staff including mental health and medical. Offenders on this range could be heard yelling for me to come out to the range and then yelling vaguely threatening statements: "I'm gonna have my people call and make you do your job! We need mental health Clarke, there is a medical emergency on 1200 range!" I was informed of these requests by floor officers Thompson and Malott and pod officer Jackson. Due to the progression of events and the amount of offenders making the vague statements of "needing mental health" and "we're suicidal," this behavior is viewed as a group attempt to harass staff and manipulate for secondary gain. It is not seen as an imminent risk of self harm.

Dkt. 286-5 at 5.

Mr. Walker has designated evidence that contradicts Ms. Clarke's version of events, showing that Mr. Walker and other inmates had informed Ms. Clarke that Mr. Walker was suicidal and needed help. Dkt. 306 at 5 ¶ 8, designating dkt. 306-1 at 431-49.

Mr. Walker contends that Nurse Lowell-Pangallo failed to pull him out for treatment after this suicide attempt.  Dkt. 306-1 at 445 (affidavit from Daurrell Figgs stating that Nurse Heather refused to pull Mr. Walker out after viewing his injuries).

Ms. Clarke met with Mr. Walker on December 22, 2021, and in addition to completing her routine assessment, she administered the Personality Assessment Inventory ("PAI").  Dkt. 286-1, ¶ 17; dkt. 286-5 at 7–8.  Ms. Clarke and Dr. Sims discussed performing the PAI given his frequency of reporting subjective mental health concerns and apparent lack of objective evidence to support the subjective reporting.  Dkt. 286-1 ¶ 17.  They wanted to be sure they had not overlooked a potential disorder or condition.  *Id.*

During the night shift on December 28, 2021, Mr. Walker began voicing thoughts of suicide to a nurse who is not a defendant in this case.  Dkt. 286-1 ¶ 19; dkt. 286-5 at 9–11.  The nurse contacted Dr. Sims as the on-call mental health provider, and Dr. Sims ordered Mr. Walker to be placed on close observation suicide watch.  Dkt. 286-1 ¶ 19; dkt. 286-5 at 9.  Dr. Sims met with Mr. Walker the next day for suicide monitoring.  Dkt. 286-1 ¶ 19; dkt. 286-5 at 12–15.  During treatment, Mr. Walker reported hearing voices, but Dr. Sims noted that Mr. Walker appeared to be present during the interview and not responding to internal stimuli.  Dkt. 286-5 at 13.  His thoughts were organized, logical, and coherent.  *Id.*  Mr. Walker remained on close observation with plans for daily monitoring.  *Id.*

Case 2:21-cv-00421-JPH-MJD    Document 308    Filed 11/07/24    Page 12 of 37 PageID #: 6383

Dr. Sims provided additional follow-up monitoring on December 30, 2021, and kept Mr. Walker on close observation out of an abundance of caution.  Dkt. 286-1 ¶ 20; dkt. 286-5 at 16–18.  Ms. Clarke began providing daily monitoring visits on January 3, 2022, when she noted that Mr. Walker denied suicidality and presented in a cooperative mood.  Dkt. 286-1 ¶ 21; dkt. 286-5 at 19–21.  In consultation with Dr. Sims, Ms. Clarke decided to continue precautionary suicide watch despite no signs or symptoms of serious mental health needs.  Dkt. 286-1 ¶ 21.

The next day, during their daily visit, Mr. Walker was reported to be noncompliant by covering his light and his cell front and refusing to give up his mat.  Dkt. 286-1 ¶ 22; dkt. 286-5 at 22.  He accused Ms. Clarke of holding him hostage.  *Id.*  Ms. Clarke consulted with Dr. Sims, and Mr. Walker remained on close observation.  Dkt. 286-1, ¶ 22; dkt. 286-5 at 22–24.  Meanwhile, Dr. Sims scored Mr. Walker's PAI, and, based on the score, concluded that Mr. Walker had exaggerated his symptoms and scored extremely high on the malingering scale.  Dkt. 286-1 ¶ 23; dkt. 286-5 at 33.

**E. January - March 2022**

On January 5, 2022, Ms. Clarke removed Mr. Walker from suicide watch given his continuing denials of suicidality and the absence of any other mental health issues.  Dkt. 286-1 ¶ 25; dkt. 286-5 at 27–29.  Ms. Clarke continued to provide Mr. Walker with routine, post-suicide watch monitoring visits, and Dr. Sims also conducted her own assessment.  Dkt. 286-1 ¶ 26–28; dkt. 286-5 at 30–32 (Jan. 6, 2022), 34–40 (Jan. 10, 12 19 visits).  Mr. Walker exhibited no

12

signs of suicidality or other objectively serious mental health needs. Dkt. 286-1 ¶ 26–28. Ms. Clarke ended Mr. Walker's post-suicide watch monitoring on February 2, 2022, after Mr. Walker intentionally ignored her attempt to visit with him cell front, and she determined that further monitoring was not needed. *Id.* ¶ 29.

Ms. Clarke received another HCRF from Mr. Walker on March 4, 2022, in which Mr. Walker claimed to be suicidal. Dkt. 286-5 at 43–45. Ms. Clarke requested that correctional officers remove Mr. Walker from his normal cell and escort him to a holding cell where he would not be able to cover his cell front or ignore her during her visit. *Id.* Mr. Walker informed Ms. Clarke that he was not actually suicidal but was just trying to get Ms. Clarke to meet with him. *Id.* at 43. Ms. Clarke concluded that Mr. Walker's increased reporting of suicidal thoughts were linked to secondary gain. *Id.* Ms. Clarke noted that Mr. Walker's suicidality was unclear but placed him on close observation suicide watch out of an abundance of caution. *Id.* at 43–44. Ms. Clarke ended suicide watch on March 7, 2022, and provided a follow-up session the next day, identifying no mental health needs or suicidal ideations and noting that Mr. Walker would continue to receive monitoring. *Id.* at 46–51. Mr. Walker continued to see mental health staff during the spring and summer of 2022 and continued filing HCRFs regarding his mental health. *See generally* dkt. 286-6 (Spring and Summer 2022 records).

**F. December 2022**

Ms. Clarke saw Mr. Walker for mental health services on December 12, 2022.  Dkt. 286-7 (December 2022 Records).  Ms. Clarke noted that Mr. Walker reported no specific mental health symptoms and appeared to be dealing with recent grief appropriately by extending contact with his family outside of prison and finding healthy distractions.  *Id.*  Mr. Walker declined an offer of education regarding sleep and grief, and his mental and behavioral status presented within normal limits.  *Id.*  There is no evidence of Mr. Walker having made any reports of suicidal thoughts or plans at any time during December 2022.  Dkt. 286-1 ¶ 40.

**G. February 2023**

After his visit with Ms. Clarke on December 12, 2022, Mr. Walker expressed no further mental health concerns or thoughts of self-harm until early 2023.

On February 6, 2023, Mr. Walker sent a letter to Mr. Vanihel expressing suicidal thoughts.  Dkt. 306-1 at 43.  Mr. Walker also sent a suicide note to Dr. Sims, Ms. Clarke, Ms. Bedwell, and Ms. Corrigan.  *Id.* at 40–41 (informal request for interview addressed to Dr. Sims); *id.* at 42 (informal request to Ms. Clarke); *id.* at 113–14 (informal grievance addressed to Ms. Bedwell); *id.* at 38–39 (informal request to Ms. Corrigan).  Mr. Walker also submitted an emergency grievance explaining his suicidal ideation.[5]  *See* dkt. 291 at 149

---

[5] Mr. Walker states that he submitted the grievance to Mr. Wellington and Ms. Crichfield.  But the grievance appeal response bears only Ms. Crichfield's name.

(Grievance Appeal stating that he filed an emergency grievance on February 8).

Ms. Crichfield signed the response to his appeal of grievance, which stated:

> Your grievance has been received and reviewed. Mental health services are available to you. Your medical records were reviewed and show you are actively on Suicide Watch as of 2/13/2023. You will continue to receive health services appropriately. In regards to your medical records request, please submit a remittance slip to receive the records.
>
> You were placed on suicide watch due to your ideations. Ms. Clarke is addressing your mental health concerns. Your mental health care is appropriate at this time.

*Id.* at 150.

On February 12, Mr. Walker told Nurse Bauman-Jones that he was suicidal. Dkt. 306-1 at 460. The Medical Defendants contend that Mr. Walker handed several HCRFs to Nurse Bauman-Jones on February 12, 2023, and that each of them was pre-dated to look as though they had been submitted well before February 12. Dkt. 286-8 at 1–2 (February 2023 Records). Nurse Bauman-Jones states that she spoke with Mr. Walker that day and he reported he was not suicidal. Dkt. 286-8 at 1. Mr. Walker attempted suicide later that evening. Dkt. 306-1 at 461.[6] Given the multiple HCRFs and reports to correctional staff, Ms. Clarke was contacted. Dkt. 286-8 at 3. She ordered

---

[6] Mr. Walker affirms that he cut his wrists, ingested pills, tied a rope around his neck, and swallowed a razor on February 13. Dkt. 306-1 at 461. He testified at his deposition that he spoke to Nurse Jones late in the evening of February 12 and attempted suicide around 1:00 or 2:00 o'clock in the morning of the 13th and was then pulled out of his cell. Dkt. 281-1 at 56. His medical records reflect that he reported during a nurse visit on February 23, 2023, with Nurse Lowell-Pangallo that he had swallowed a razor on February 12 after harming himself. Dkt. 286-8 at 24. An x-ray examination revealed no razor. *Id.*

close observation suicide watch, which was initiated at 1:30 a.m. on February 13, 2023. *Id.* at 3. When Ms. Clarke conducted her suicide watch visit with him on February 13, she noted that he did "not present any mental health issues at this time." *Id.* at 5.

The next day, Ms. Clarke observed Mr. Walker lying on a mat on his cell floor. He reported feeling "different," but refused to elaborate and would not directly answer questions regarding suicidality. *Id.* at 7–10. Ms. Clarke therefore renewed his close observation orders for at least one more day. *Id.* at 8. Ms. Clarke returned to meet with Mr. Walker on February 15, when Mr. Walker denied any thoughts or plans of self-harm. *Id.* at 11–14. When Ms. Clarke confronted Mr. Walker regarding the backdated HCRFs he handed to Nurse Bauman-Jones the preceding Sunday night/Monday morning, he refused to respond and attempted to distract and create division among healthcare services staff. *Id.* at 12. Ms. Clarke continued suicide watch orders until she could consult with Dr. Sims and other mental health team members. *Id.*

Ms. Clarke continued to monitor Mr. Walker and released him from suicide watch after he agreed not to take any action to harm himself and to engage appropriately during follow-up monitoring sessions. *Id.* at 15–17. Ms. Clarke offered follow-up services through February 21, 2023, with Mr. Walker engaging and presenting no mental health issues. *Id.* at 18–23. Ms. Clarke saw Mr. Walker again on March 1, 2023, and March 17, 2023. *Id.* at 25–29. When Mr. Walker refused to engage during the March 17 session and

16

pretended to sleep, Ms. Clarke considered the services refused, noted that no

additional monitoring was indicated, and scheduled Mr. Walker for a routine

30-day follow up. *Id.* at 29.

> On May 19, 2023, Mr. Walker's mental health code was a D, meaning:
>
> Psychiatric disorder that requires frequent individual psychiatric and/or psychological services and/or the individual has a history of one or more of the following:
> > a) a serious suicide attempt and are newly (within the last year) admitted to the IDOC; and/or,
> > b) have had a serious suicide attempt or a serious self-injury within the last year; and/or,
> > c) who are involuntary medication for the treatment of a mental health condition.  Services needed may be routine and/or unplanned in nature and may involve mental health monitoring.

Dkt. 306-1 at 428–29 (medical records written by Dr. Sims).

### H. Procedural history

Mr. Walker filed his initial complaint in this case on November 8, 2021.

Dkt. 1.  He amended his complaint twice.  Dkts. 22, 167.  Because the second

motion to amend was granted, dkt. 177, the second amended complaint is the

operative pleading.  Under the order screening the second amended complaint,

the claims proceeding in this case are Mr. Walker's claims that all defendants

were deliberately indifferent to his suicidality in violation of his Eighth

Amendment rights and retaliated against him for filing grievances and lawsuits

by denying him medical care in violation of his First Amendment rights.  *Id.*

**III.**
**Discussion**

## A. Deliberate Indifference

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 888–89 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

### 1. Serious Medical Need

The Medical Defendants first argue that Mr. Walker never experienced a serious medical need. Genuine suicidal ideation is an objectively serious medical condition, *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019), and prison officials cannot ignore or fail to treat a prisoner who is genuinely suicidal, *Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020).

The Medical Defendants explain that Mr. Walker's medical providers consistently found that Mr. Walker did not display signs or symptoms of

18

mental health issues.  When Dr. Sims scored the PAI, the results confirmed that Mr. Walker displayed no legitimate mental health issues and that he significantly exaggerated his symptoms while measuring as an extreme malingerer.  Dkt. 286-1 ¶ 23; dkt. 286-5 at 33.  Based on the medical records, the Medical Defendants argue that Mr. Walker never attempted suicide.  Dkt. 287 at 19.

In support of their position that the Court should rely only on the medical records, the Medical Defendants reference the Supreme Court's holding in *Scott v. Harris* that when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  550 U.S. 372, 380 (2007).  In *Scott*, the disputed factual issue was whether a motorist fleeing law enforcement officials was driving in a way that endangered human life.  *Id.* at 378–80.  The non-moving party's version of events was discredited by a videotape that recorded the incident.  *Id.* at 380.

Here, Mr. Walker's medical records are not an indisputable objective record of his medical treatment.  Although those records do not indicate that any medical professional determined that Mr. Walker had serious mental health issues, *see, e.g.*, 286-3 at 5 (finding that Mr. Walker "does not meet Serious Mental Illness criteria at this time"), Mr. Walker has testified that he attempted to harm himself on several occasions.  Dkt. 281-1 at 13, 56.  A court may find as a matter of law that a medical provider reasonably determined that

a prisoner did not have a serious mental health issue after that provider

provides a detailed mental health exam in response to a plaintiff's complaints.

*See Podkulski v. Williams*, No. 15-CV-11870, 2022 WL 991963, at *6 (N.D. Ill.

Mar. 31, 2022). But here, Mr. Walker has identified incidents where he

complained of suicidality, received no timely assessment, and then shortly

thereafter harmed himself. Resolution of the conflicting versions of events will

turn on the credibility of the witnesses. Therefore, the medical records are not

dispositive like the video was in *Scott.*

Moreover, unlike the prisoner in *Lord* who did not allege any other injury

arising from his "insincere suicide threat," *Lord*, 952 F.3d at 905, Mr. Walker

testified that he attempted suicide on multiple occasions, resulting in various

physical injuries. So, while a jury could find from the defendants' designated

evidence that Mr. Walker was never genuinely suicidal, a jury could also find

from Mr. Walker's designated evidence that was suicidal and that he attempted

suicide on multiple occasions which resulted in physical injuries.

Therefore, the Court cannot determine on summary judgment whether

Mr. Walker had a serious medical condition.

### 2. Subjective Intent

All defendants argue that even if Mr. Walker had a serious medical

condition, they are nonetheless entitled to summary judgment because they

did not disregard a known risk of harm to Mr. Walker. "Where the harm at

issue is a suicide or attempted suicide, the second, subjective component of an

Eighth Amendment claim requires a dual showing that the defendant: (1)

20

subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). This requires "more than mere or gross negligence, but less than purposeful infliction of harm." *Lisle*, 933 F.3d at 717 (quoting *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)). "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted).

### a. Medical Defendants[7]

### i. Ms. Bedwell, Ms. Hobson, and Ms. Corrigan

Ms. Bedwell, Ms. Hobson, and Ms. Corrigan were not a part of the mental health team that provided Mr. Walker with mental health treatment. Dkt. 286-1 ¶ 54. And it is undisputed that Mr. Walker's interactions with these defendants were minimal. In early February 2023, Mr. Walker sent a suicide note to Ms. Corrigan and Ms. Bedwell, among others. Dkt. 306-1 at 38–39 (informal request for interview addressed to Ms. Corrigan), *id.* at 113–14 (informal grievance addressed to Ms. Bedwell). But there is no evidence that

---

[7] Each individual defendant's participation in Mr. Walker's care is discussed separately. The Court notes that Mr. Walker contends throughout his brief generally that "all defendants" have a history of refusing care to him and other inmates. But these arguments are not specific enough to allow a conclusion that a particular defendant behaved in a specific way during the time at issue in this case. "Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough." *Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) (cleaned up). Therefore, the Court focuses only on Mr. Walker's designation of specific evidence regarding each defendant's actions in this case.

these defendants received his note before his mid-February suicide attempt.[8] There is also evidence that Mr. Walker submitted an emergency grievance in February 2023 explaining his suicidal ideation and that Ms. Corrigan later responded to his appeal of this grievance. *See id.* at 109, 121. Mr. Walker also addressed an informal grievance to Ms. Bedwell in March of 2022, and the response to that request reflects that Ms. Clarke saw him for treatment. *Id.* at 12. In addition, on June 30, 2022, Ms. Bedwell wrote to Ms. Crichfield stating, "He last refused on 6-22-22. Was offered an out of cell visit. He refused." *Id.* at 62. Mr. Walker designates no evidence that these defendants knew he was suicidal before he attempted suicide, or that they knew the mental health providers were not treating him.

Similarly, when asked what specific acts or omissions Ms. Hobson took that violated his rights, Mr. Walker testified: "I believe she was HSA from the first parts of the incident, from September to December. I believe she was the HSA at that time. Like I said, when these incidents were reported, they failed to act." Dkt. 281-1 at 60. But Mr. Walker has pointed to no evidence that Ms. Hobson was aware of his suicidal ideation.

---

[8] Mr. Walker testified that he sent the notes to the defendants by putting them in his mailbag and knows that the defendants received them because he received responses. Dkt. 281-1 at 58. But Mr. Walker has no personal knowledge and has designated no evidence regarding when these defendants received his notes and thus any argument that they received the notes before he harmed himself and nonetheless took no action to prevent this action is purely speculation. "[I]nferences supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007). This testimony is not enough to show that the defendants received the notes *before* he harmed himself and therefore were made aware of his suicidality in time to intervene.

Without evidence that these defendants were deliberately indifferent of any risk to Mr. Walker, they are entitled to summary judgment. *See Collins*, 462 F.3d at 761.

### ii. Ms. Clarke

Ms. Clarke argues that she is entitled to summary judgment because she promptly and reasonably provided Mr. Walker treatment when she was aware that he had expressed suicidal ideation. Ms. Clarke's argument is supported by designated evidence showing that between September 20, 2021, and March 17, 2023, Ms. Clarke met with Mr. Walker on numerous occasions and consulted with Dr. Sims on numerous occasions about a treatment plan for Mr. Walker. Mr. Walker, however, has designated evidence from which a jury could find that on December 13, 2021, Ms. Clarke did not timely respond to a known risk that Mr. Walker was suicidal, that he tried to kill himself that day, and that he sustained physical injuries as a result.

Mr. Walker's designated evidence shows that he complained of suicidal thoughts on December 13, 2021, after he alleged that Officer Whippo sexually harassed him. Dkt. 281-1 at 33–39. Mr. Walker and other inmates informed Ms. Clarke that Mr. Walker was suicidal and needed help. Dkt. 306 at 5 ¶ 8, designating dkt. 306-1 at 431–49 (affidavits from other inmates stating that Ms. Clarke became aware of Mr. Walker's suicidal ideations on 12/13). Specifically, other inmates have provided sworn testimony stating, "I witnessed R. Walker yell to Sarah Clarke that he was suicidal" and "I, myself and other

Individuals also told Sarah Clarke that R. Walker was feeling suicidal and needed her help." Dkt. 306-1 at 444 ¶¶ 5–6.

Medical Defendants did not file a reply brief addressing this designated evidence and defendants' designated evidence, dkt. 286-5, at best shows a dispute as to what Ms. Clarke knew about Mr. Walker's condition on December 13. From this evidence, a jury could find that Ms. Clarke knew that Mr. Walker was suicidal on December 13, that she did not timely respond to that risk, and that Mr. Walker tried to kill himself that day. And from this finding, a jury could reasonably conclude that Ms. Clarke was deliberately indifferent. Still, there is ample evidence for a jury to reach the opposite conclusion, finding that Ms. Clarke's course of treatment of Mr. Walker was reasonable and that she never disregarded a known risk. Either way, a jury will have to sort through the evidence and make credibility findings to decide whether Ms. Clarke was deliberately indifferent to a known risk that Mr. Walker was suicidal.

Accordingly, Ms. Clarke is not entitled to summary judgment on Mr. Walker's deliberate indifference claim.

### iii. Dr. Sims

Mr. Walker asserts that Dr. Sims was also made aware of his suicidality through reports from officers, informal grievances, and emails. *See* dkt. 281-1 at 10, dkt. 306-1 at 40, 425. Mr. Walker testified that Officer Niswander said that he told Lieutenant Holcomb, Ms. Clarke, and Dr. Sims about his suicidal thoughts. Dkt. 281-1 at 10. As with the informal grievances and notes sent to

defendants Bedwell, Hobson, and Corrigan, there is no evidence that Dr. Sims received them and therefore no evidence that these reports made Dr. Sims aware of Mr. Walker's suicidality.

Regarding the events of December 13, 2021, Ms. Clarke's incident report, dkt. 286-5 at 5, is the only account that Dr. Sims received. Dkt. 286-1 ¶ 16. Even if Ms. Clarke knew of Mr. Walker's complaints of suicidality, there is no evidence that Dr. Sims knew.

Dr. Sims then conducted a PAI of Mr. Walker on December 22, 2021. Dkt. 286-1 ¶ 17; dkt. 286-5 at 7–8. About a week later, December 28, 2021, Mr. Walker began voicing thoughts of suicide to an on-duty facility nurse. Dkt. 286-1 ¶ 19; dkt. 286-5 at 9–11. The nurse contacted Dr. Sims as the on-call mental health provider, and Dr. Sims ordered Mr. Walker to be placed on close observation suicide watch. Dkt. 286-1 ¶ 19; dkt. 286-5 at 9. Mr. Walker was kept on suicide watch until January 5, 2022. Dkt. 286-1 ¶ 25; dkt. 286-5 at 27–29. Ms. Clarke continued to provide Mr. Walker with routine, post-suicide watch monitoring visits, and Dr. Sims conducted her own assessment as well. Dkt. 286-1 ¶ 26–28; dkt. 286-5 at 30–32 (Jan. 6, 2022 visit), 34–40 (Jan. 10, 12, 19 visits).

The designated evidence shows that when she was made aware of Mr. Walker's suicidal complaints, Dr. Sims responded by conducting a PAI. Other than in late December of 2021, there is no evidence that Dr. Sims was directly made aware of Mr. Walker's complaints of suicidality. At that time, she placed Mr. Walker on suicide watch. Accordingly, there is no evidence that Dr. Sims

was aware of a risk to Mr. Walker that she disregarded, and she is entitled to summary judgment.

### iv. Ms. Lowell-Pangallo and Ms. Hill

It is undisputed that Ms. Lowell-Pangallo and Ms. Hill were not personally involved in providing Mr. Walker with mental health treatment. Dkt. 286-1 ¶ 54.  Mr. Walker has designated evidence, however, that he complained to them of his suicidality.  Mr. Walker testified that he handed a HCRF to "maybe a nurse Heather [Lowell-Pangallo]," on September 17, 2021, complaining of suicidality and that she did not help him.[9]  Dkt. 281-1 at 12. But he also argues that he gave his HCRF to Ms. Hill that day.  Dkt. 306 at 3; dkt. 306-1 at 431 (affidavit from Xavier Deluna stating that he saw Mr. Walker tell Ms. Hill he was suicidal).  Therefore, there is designated evidence that Mr. Walker complained to Ms. Lowell-Pangallo and Ms. Hill of suicidality in September of 2021, they did not do anything in response, and he later attempted suicide.  From this evidence, a reasonable jury could conclude that these defendants were aware of a risk to Mr. Walker and disregarded it.  They are therefore not entitled to summary judgment.

### v. Ms. Bauman-Jones

Ms. Bauman-Jones contends that Mr. Walker handed her seven different HCRFs on February 12, 2023, each pre-dated to look as though they had been

---

[9] The defendants point out that Mr. Walker testified at his deposition that he would not even be able to identify these nurses.  But Mr. Walker also testified that nurses were wearing masks at this time, and therefore difficult to identify, so he identified them based on logs on when they worked.  Dkt. 281-1 at 55.

submitted previously.  Dkt. 286-8 at 1.  She also asserts that she spoke with Mr. Walker that day and he reported he was not suicidal.  *Id.*  But Mr. Walker has designated evidence that he complained of suicidality to Ms. Bauman-Jones on February 12, 2023, she disregarded his complaints, and he attempted suicide thereafter.  Dkt. 281-1 at 55–56.  A reasonable jury crediting Mr. Walker's evidence could conclude that Ms. Bauman-Jones was deliberately indifferent to his risk of suicide.  She therefore is not entitled to summary judgment.

### vi. Centurion

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983 and can be sued when their actions violate the Constitution.  *Dean*, 18 F.4th at 235 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).  To succeed on his *Monell* claim, Mr. Walker must identify an action taken by Centurion and a causal link between Centurion's action and the deprivation of federal rights.  *Id.*  "A municipality 'acts' through its written policies, widespread practices or customs, and the acts of a final decisionmaker."  *Levy v. Marion Co. Sheriff*, 940 F.3d 1002, 1010 (7th Cir. 2019).

Mr. Walker's claims against Centurion are based on his belief that "Centurion should be responsible for what [the individual defendants] have done."  Dkt. 281-1 at 51–52 (Walker deposition).  Mr. Walker further argues that Centurion staff have "a long standing history of refusing inmates medical

treatment."  Dkt. 306 at 7.  But he has designated no evidence of a specific policy, practice, or custom on Centurion's part that resulted in the alleged deprivation of his rights.  Centurion is therefore entitled to summary judgment.

### b. Correctional Defendants[10]

"Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need."  *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021).  The subjective prong of a deliberate indifference claim requires a showing that the "prison official knows of a substantial risk of harm to an inmate and 'either acts or fails to act in disregard of that risk.'"  *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (quoting *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012)).  The Seventh Circuit has "long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment."  *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019).  Thus, "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."  *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005)).

---

[10] As with the Medical Defendants, Mr. Walker argues generally that the correctional defendants have a history of refusing inmates healthcare.  Dkt. 306 at 6.  Again, these types of generic statements are too vague to support his claims.  *See Daugherty*, 906 F.3d at 611.

### i. Sergeant Ashba and Officers Niswander, Thompson, and Whippo[11]

Sergeant Ashba and Officers Niswander, Thompson, and Whippo were correctional officials at WVCF during the relevant time. Each of these defendants deny having known that Mr. Walker complained of suicidal thoughts and testify that, if they were informed by an inmate that he was experiencing suicidal ideation, they would report the matter to appropriate facility personnel. Dkt. 281-7 ¶¶ 5–7; dkt. 281-8 ¶¶ 5–6; dkt. 281-9 ¶¶ 5–6; dkt. 281-10 ¶¶ 5–6; dkt. 281-11 ¶¶ 5–6.

Mr. Walker testified that on September 17, he told Officer Niswander that he was having suicidal ideations. Dkt. 281-1 at 9. Mr. Walker further testified that Officer Niswander said that he informed Lieutenant Holcomb, Ms. Clarke, and Dr. Sims about Mr. Walker's suicidal thoughts. *Id.* at 10. Also, Officer Niswander observed him hanging up a rope and took the rope from him. *Id.* A reasonable jury could conclude that Officer Niswander adequately addressed Mr. Walker's complaints of suicidality by informing others and by taking away Mr. Walker's makeshift rope. On the other hand, a jury could find that although Officer Niswander took Mr. Walker's makeshift rope, he did not take further measures to protect Mr. Walker, who attempted suicide later that day. Officer Niswander is therefore not entitled to summary judgment.

---

[11] Mr. Walker contends that video footage will show these defendants refusing to help him. But, as with the Medical Defendants, there is no description of these defendants in the record, so the Court is not able to identify them in the video that has been provided.

Mr. Walker has also designated evidence that Sergeant Ashba and Officers Whippo and Thompson were made aware of his suicidal thoughts in December of 2021, and they did nothing in response.  Dkt. 281-1 at 33–36. Mr. Walker's complaints were reported to Ms. Clarke, but she also would not see him that day, reporting instead that Mr. Walker and other inmates were attempting to harass staff.  Dkt. 286-5 at 5.  Although non-medical officials are usually justified in believing that a prisoner is in capable hands when the prisoner is under the care of medical professionals, they "cannot simply ignore an inmate's plight" if they are aware that medical personnel are not treating him.  *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (citing cases).

A reasonable jury considering this evidence in the light most favorable to Mr. Walker might conclude that these defendants knew Mr. Walker was suicidal, knew that Ms. Clarke refused to treat him, and failed to act to protect him from harming himself.  These defendants therefore are not entitled to summary judgment on Mr. Walker's Eighth Amendment claims.

### ii. Ms. Crichfield, Ms. Templeton, and Mr. Wellington

Ms. Crichfield, Ms. Templeton, and Mr. Wellington were responsible for processing grievances at the time of the incidents at issue in this case.  The designated evidence reflects that all grievances Ms. Crichfield, Ms. Templeton, and Mr. Wellington received from Mr. Walker, whether properly or improperly filed, that claimed he needed mental health treatment or was experiencing suicidal ideation were referred to appropriate medical personnel to be addressed.  Dkt. 281-12 ¶¶ 5, 7; dkt. 281-13 ¶¶ 5, 7; dkt. 281-14 ¶¶ 6, 8.

Because Mr. Walker has not designated specific evidence that these defendants disregarded his grievances or had reason to believe that medical staff were not providing him care, they are entitled to summary judgment.

### iii. Lt. Holcomb and Warden Vanihel

Warden Vanihel and Lieutenant Holcomb were supervisors at WVCF and were not involved in the day-to-day mental health treatment scheduling and mental health treatment of inmates. *See* dkt. 281-7 ¶¶ 4, 8; dkt. 281-15 ¶ 4.

Mr. Walker argues that Lieutenant Holcomb and Warden Vanihel both failed to ensure that he received adequate health care. But "individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (quoting *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010)). "Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation . . . . A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). In other words, their roles as supervisors are not sufficient to subject them to liability.

Mr. Walker also argues that each defendant failed to act despite knowing of his suicidal ideation. But the only evidence Mr. Walker designates to support this argument as to Lieutenant Holcomb is his testimony that Officer Niswander said that he told Lieutenant Holcomb and others about Mr. Walker's

31

suicidal thoughts, dkt. 281-1 at 10, and that his family called Lieutenant Holcomb's office, dkt. 290 at 2. This evidence is too vague to allow a conclusion that Lieutenant Holcomb was made aware of a serious threat to Mr. Walker and failed to act. Mr. Walker also claims that he sent a suicide note to Warden Vanihel, but there is no evidence that Warden Vanihel received it and therefore there is no evidence that Warden Vanihel was personally aware of a serious threat to Mr. Walker.

For these reasons, Lieutenant Holcomb and Warden Vanihel are entitled to summary judgment on Mr. Walker's Eighth Amendment claims.

### B. Retaliation

Only the Correctional Defendants seek summary judgment on Mr. Walker's retaliation claims. But, as discussed below, based on the designated evidence, the Court finds that the Medical Defendants, Ms. Bedwell, Ms. Hobson, Ms. Corrigan, and Dr. Sims, are also entitled to summary judgment on Mr. Walker's retaliation claims.

To succeed on a First Amendment retaliation claim, a plaintiff must come forward with evidence sufficient to allow a reasonable jury to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants' decision to take the allegedly retaliatory action. *Jones v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). If he does so, the burden shifts to the defendants to show that the deprivation would have occurred even if he had not engaged in protected

activity.  *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020).  If they can make

that showing, the burden shifts back to the plaintiff to demonstrate that the

proffered reason is pretextual or dishonest.  *Id.*  The defendants do not dispute

that Mr. Walker engaged in protected First Amendment activity by submitting

grievances, so the Court focuses on the second and third elements.

Whether allegedly retaliatory conduct would "deter a person of ordinary

firmness" from exercising his First Amendment rights is an objective test,

*Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020), and the standard "does

not hinge on the personal experience of the plaintiff," *Holleman v. Zatecky*, 951

F.3d 873, 880 (7th Cir. 2020).

"The 'motivating factor' [element] amounts to a causal link between the

activity and the unlawful retaliation."  *Manuel*, 966 F.3d at 680.  This element

may be proven by circumstantial evidence, which may include suspicious

timing; ambiguous statements, behavior, or comments directed at others in the

protected group; evidence that similarly situated people were treated

differently; and evidence that the decisionmaker offered a pretextual reason for

an allegedly retaliatory action.  *Id.*; *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635,

643–44 (7th Cir. 2013); *cf. Nieves v. Bartlett*, 587 U.S. 391, 406–07 (2019)

(probable cause usually defeats retaliatory arrest claim but not if plaintiff

presents objective evidence that he was arrested when otherwise similarly

situated individuals who did not engage in the same sort of protected speech

were not).  Nonetheless, "[a]llegedly protected speech cannot be proven to

motivate retaliation, if there is no evidence that the defendants knew of the

protected speech." *Stagman v. Ryan*, 176 F.3d 986, 999–1000 (7th Cir. 1999) (quoting *O'Connor v. Chi. Transit Auth.*, 985 F.2d 1362, 1370 (7th Cir. 1993)).

### 1. Correctional Defendants

First, Mr. Walker agrees that "[d]efendants Niswander, Whippo, Thompson, and Ashba have been disavowed from any retaliation claims." Dkt. 290 at 2; *see also* dkt. 281-1 at 43 (testifying that his retaliation claims are against the supervisors). Thus, these defendants are entitled to summary judgment on Mr. Walker's retaliation claims.

The remaining Correctional Defendants do not deny that Mr. Walker participated in First Amendment activity by filing grievances, but they argue that there is no evidence that they took any adverse action against Mr. Walker because he filed grievances.

The Court has already found that Ms. Crichfield, Ms. Templeton, and Mr. Wellington did not fail to process his grievances properly. Mr. Walker has not designated evidence that they played any role in allegedly denying him care or that they took any adverse action against him because he filed grievances. Similarly, as the Court has already explained, there is no evidence that Lieutenant Holcomb and Warden Vanihel were personally involved in Mr. Walker's mental health treatment or were aware that he had a need for treatment and failed to act. All the Correctional Defendants are entitled to summary judgment on Mr. Walker's retaliation claims.

### 2. Medical Defendants

Although the Medical Defendants did not move for summary judgment on Mr. Walker's retaliation claims, the Court's review of the designated evidence reveals that, like the grievance officials and the supervisory defendants, there is no evidence to support a conclusion that many of the Medical Defendants retaliated against Mr. Walker. Specifically, Ms. Bedwell, Ms. Hobson, and Ms. Corrigan were only minimally involved in Mr. Walker's care and were not aware that Mr. Walker was not getting treatment for his suicidality. The same is true for Dr. Sims. The evidence reveals that Dr. Sims considered Mr. Walker's complaints, conducted an assessment, and placed him on suicide watch when she was made aware of his suicidal thoughts. Finally, Mr. Walker has designated no specific evidence that Centurion had a policy, practice, or custom of retaliating against inmates. Accordingly, the Court finds that these defendants are entitled to summary judgment on Mr. Walker's retaliation claims.

Because there is evidence that would allow a jury to find that Ms. Clarke, Ms. Bauman-Jones, Ms. Lowell-Pangallo, and Ms. Hill denied Mr. Walker treatment for his suicidality, these defendants are not entitled to summary judgment on his First Amendment claims.

### IV.
### Conclusion

Mr. Walker's motion for leave to file surreply, dkt. [304], is **GRANTED** only to the extent his surreply was considered. The Correctional Defendants' motion for summary judgment, dkt. [280], and the Medical Defendants' motion,

dkt. [285], are each **GRANTED IN PART AND DENIED IN PART** as set forth below.

The Correctional Defendants' motion is **GRANTED** as to Mr. Walker's Eighth Amendment and retaliation claims against Ms. Crichfield, Ms. Templeton, Mr. Wellington, Lieutenant Holcomb, and Warden Vanihel. The **clerk shall terminate** these defendants on the docket. The motion is also **GRANTED** as to Mr. Walker's retaliation claims against defendants Sergeant Ashba and Officers Whippo, Thompson, and Niswander. Those claims are **dismissed**.

The Medical Defendants' motion for summary judgment is **GRANTED** as to Mr. Walker's Eighth Amendment claims against Ms. Bedwell, Ms. Hobson, Ms. Corrigan, Dr. Sims, and Centurion. Further, under Rule 56(f)(1), the Court gives Mr. Walker notice of its intent to grant summary judgment in favor of Ms. Bedwell, Ms. Hobson, Ms. Corrigan, Dr. Sims, and Centurion on his retaliation claims. Mr. Walker shall have **until December 6, 2024**, to file a response to this notice by designating specific evidence to show that these defendants retaliated against him.

Mr. Walker's Eighth Amendment claims against Sergeant Ashba, Officers Whippo, Thompson, and Niswander, and his First and Eighth Amendment claims against Ms. Clarke, Ms. Bauman-Jones, Ms. Lowell-Pangallo, and Ms. Hill remain.

Finally, the Court has reconsidered its Order denying Mr. Walker's motion for assistance with recruiting counsel. Dkt. 120. That motion, dkt. 93,

is now **GRANTED** and the Court will seek to recruit counsel to represent Mr.

Walker and he will be notified when this step has been taken.  In the

meantime, Mr. Walker should continue to litigate on his own to the best of his

ability.

**SO ORDERED.**

Date: 11/7/2024

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

RAFAEL L. WALKER
166671
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All ECF-registered counsel of record via email